**In re JLS SHAMUS, INC., Debtor.**

**Bankruptcy No. 94–8564–9P1.**

United States Bankruptcy Court,
M.D. Florida,
Ft. Myers Division.

Feb. 1, 1995.

Phillip J. Jones, Port Charlotte, FL, for debtor.

Roberta A. Colton, Tampa, FL, for FMS Management Systems, Inc.

**ORDER ON MOTION TO LIFT AUTO-MATIC STAY AND MOTION TO AS-SUME EXECUTORY CONTRACTS**

ALEXANDER L. PASKAY, Chief Judge.

IN THIS Chapter 11 case the matters under consideration are a Motion to obtain relief from the automatic stay filed by FMS Management Systems, Inc. (FMS) and a Motion To Assume An Unexpired Executory Contract, filed by JLS Shamus, Inc. (Debtor). The issues involved in both matters are interconnected in light of the fact that if the Debtor is unable to assume the executory contract, it clearly has no realistic basis to achieve rehabilitation because unless its contract with FMS is assumed it will have to cease to operate its business and in turn also ceases to be an economically viable enterprise.

The facts as established at the final evidentiary hearing are basically without dispute and are as follows:

FMS is the holder of an exclusive franchise from IHOP Corp. (International House of Pancakes) to own, operate, and license IHOP restaurants in the State of Florida. The Debtor is currently a sub-franchisee and operates such a facility in Punta Gorda, Florida pursuant to an original agreement entered into with FMS in 1980. The contract under consideration had three components: the Lease of the Premises (Creditor's Exhibit No. 1); an Equipment Lease (Creditor's Exhibit No. 2); and a License Agreement (Creditor's Exhibit No. 3). Pursuant to this contract the Debtor was to make an initial payment of $35,000.00 and also was to execute a promissory note in the amount of $115,000.00, for a total license fee of $150,-000.00. The promissory note, which was executed on June 9, 1980, provided for weekly payments of a stated amount plus interest on the unpaid principal balance at the rate of 8% per annum. (Creditor's Exhibit No. 17). Under the franchise, sometimes referred to as a license, the Debtor was also required to make weekly payments equal to 12.8 percent of the gross sales, with a minimum payment of $1,275.00, for the real estate lease, and an adjusted rate of $210.00 per week for the equipment lease.

The Debtor had difficulty meeting its contractual obligations and frequently was in default during the entire course of the contract. As a matter of fact, FMS notified the Debtor on May 5, 1992, that it was again in default under its monetary obligations. (Creditor's Exhibit No. 7). Notices of default were also sent to the Debtor on July 23, 1992 (Creditor's Exhibit No. 6) and November 1, 1992 (Creditor's Exhibit No. 8). In this latter notice, FMS informed the Debtor that unless it executed a new promissory note in the amount of $30,000.00, which represented the outstanding arrearage at that time, FMS would demand that the entire arrearage be paid immediately. FMS also notified the Debtor in this letter that this was the "last attempt to help" the Debtor, and that no further defaults would be tolerated. The new Note was executed on November 13, 1992, and provided for weekly payments in the amount of $143.38.

The record also reflects that FMS had loaned money on at least 2 prior occasions. On February 10, 1987, the Debtor executed an Agreement whereby it agreed to become a co-obligor of a series of loans made to John L. Shamus, the President of the Debtor, in the total amount of $37,144.67. (Creditor's Exhibit 9). This Agreement also states that a default under these obligations constitutes a breach of the License Agreement. Subsequently, in January of 1988, the Debtor executed yet another promissory note payable to FMS in the amount of $3,571.87 (Creditor's Exhibit 10).

It is without dispute that the Debtor has in fact reduced the original $115,000.00 note over 14 years and now has an approximate remaining balance of $17,200.00, and that it also reduced the $30,000.00 note executed on November 13, 1992, and now has an outstanding remaining balance on this note of $22,700.00. However, the sales records and payment history of the Debtor under its obligation does not show a very encouraging picture. In 1987, the Debtor posted gross sales of $781,790.00. In 1988, however, gross sales decreased by 11.2%, and such sales further decreased by 4.8% in 1989, 11.3% in 1990, 9.8% in 1991, and 2.8% in 1992. In 1993 it presented an increase of 7.2 percent, but the first 8 months of the current fiscal year again indicate a .4 percent decrease. (Creditor's Exhibit No. 16). The Debtor frequently was delinquent in the two payments, and made no payments at all to FMS on any of its obligations from July 10, 1994 through August 28, 1994. (Creditor's Exhibit 15). The final termination notice by FMS was sent to the Debtor on August 26, 1994 informing the Debtor that the termination will be effective September 2, 1994 unless all arrearages are cured. (Creditor's Exhibit 4). The Debtor filed its Petition for Relief in this Court under Chapter 11 on September 2, 1994. Pursuant to the previously entered adequate protection order by this Court the Debtor is current on its post-petition obligations.

In its Motion to assume this franchise/license agreement, together with its components, the real estate and equipment leases, the Debtor proposes to cure the defaults in 18 weeks provided the default is only $20,-

000.00. In calculating the default it is the Debtor's position that the only proper items of default are its obligations under the real estate lease and the equipment lease, but that its obligations represented by the two promissory notes are merely unsecured obligations and it is therefore not required to include the amounts due on the notes in the default which must be cured as a condition precedent for assumption under § 365(b)(1). It is FMS' position that the default is approximately $60,000.00 instead of $20,000.00 because the two notes in question also represent obligations under the franchise agreement. Consequently, FMS asserts that the Debtor should not be permitted to assume this franchise/license agreement unless it promptly cures all defaults, including defaults under the notes, because the several payments under the Franchise Agreement "package" are not severable and each is dependent on the other. The Debtor concedes that if FMS is correct, it cannot cure these defaults before the end of the contract which is to terminate in the year 2003 according to its terms. In support of this proposition FMS cites *In re Offices & Serv. of White Plains Plaza, Inc.*, 56 B.R. 607 (Bankr. S.D.N.Y.1986). In this case the bankruptcy court held that the Debtor was required to provide adequate assurance of prompt cure not only with respect to the prepetition default which occurred immediately prior to the commencement of the case, but that it must also cure previous rental arrearages as reflected in a promissory note signed by the Debtor. Counsel for the Debtor has not been able to furnish any authority contrary to the holding of *In re Offices & Serv. of White Plains Plaza, Inc.*, but contends that it should be distinguished because, among other factors, in the present instance the Debtor proposed, under an agreement with the franchisor, to furnish adequate protection by continuing to make the regular weekly payments as required by the leases and the notes.

The defense urged by counsel for the Debtor is really nothing more than a distinction without a difference. The default under consideration involves the Debtor's failure to make the weekly payments it was required to pay pursuant to the original premises lease (Creditor's Exhibit 2) and License Agreement (Creditor's Exhibit 3), as well as the two promissory notes, one dated June 9, 1980 (Creditor's Exhibit No. 17) and one dated November 13, 1992 (Creditor's Exhibit No. 8). Unlike the note in *Offices & Serv. of White Plains Plaza, Inc.*, which represented only the accrued and unpaid rent, these notes represent all the monetary obligations of the Debtor which include, as stated earlier, the Debtor's obligation to pay royalty fees, advertising fees, equipment lease payments, rent for the premises, and cooperative advertising fees, if any (Creditor's Exhibits Nos. 1, 2 & 3). Further, the notice of default dated August 26, 1994 (Creditor's Exhibit No. 4) stated a default under all obligations of the Debtor, and specified that these obligations included not only the premises and equipment rental, but also the royalty fees, advertising fees, and promissory notes.

Unfortunately, it is difficult to separate the monetary obligations of the Debtor and, in essence, while each obligation requires a different amount of payment, the note that was executed on November 13, 1992, included the defaults under all of the related documents. The Debtor also intimates that the franchisor should not be permitted to urge a default because it had the option to seek eviction or cancellation of the lease and license agreement when the original default occurred, but instead voluntarily agreed to accept the promissory note for the arrearage amounts. According to counsel for the Debtor, based on this, the Debtor should only be required to cure the present rent arrearages as opposed to either the defaults on the note or the entire balance of the note. While the Debtor's argument has a ring of plausibility, it really does not bear close analysis, especially when coupled with the very dismal payment history of this Debtor. During the entire franchise agreement, the Debtor was repeatedly in default. For instance, in the week ending May 30, 1993, the Debtor was in default in the total amount of $13,216.14 which, of course, included the defaults under the notes. As far back as July 23, 1992, the Debtor was in default in the amount of $18,957.49 (Creditor's Exhibit No. 6). Between 1987 and 1994, with the exception of 1993,

the Debtor's sales decreased each year, at times at a rate of over 11% per year. (Creditor's Exhibit No. 16). Thus, even assuming without conceding that the amount which the Debtor is required to promptly cure is strictly limited to the unpaid rent, considering the totality of the picture, including the payment history and operating history, this record fails to furnish persuasive evidence that the Debtor is able to promptly cure the default.

This Court is also satisfied that the Debtor has failed to furnish adequate assurance of future performance which is an additional condition precedent to the assumption of an unexpired lease or executory contract pursuant to § 365(b)(1)(C).

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Amended Motion to assume Executory Contracts of FMS Management Systems, Inc., filed by the Debtor be, and the same is hereby, denied. It is further

ORDERED, ADJUDGED AND DECREED that the Amended Motion to Lift the Automatic Stay filed by FMS Management Systems, Inc., be, and the same is hereby, granted.

DONE AND ORDERED.